Cite as 2023 Ark. App. 551

# ARKANSAS COURT OF APPEALS

### DIVISION I
No. CV-22-150

| | |
|---|---|
| LEANNE CARPENTER AND SHELLEY BENTON<br><br>APPELLANTS<br><br>V.<br><br>COREY PATTERSON<br><br>APPELLEE | Opinion Delivered November 29, 2023<br><br>APPEAL FROM THE PRAIRIE COUNTY CIRCUIT COURT, NORTHERN DISTRICT<br>[NO. 59NPR-13-22]<br><br>HONORABLE CRAIG HANNAH, JUDGE<br><br><br>AFFIRMED |

**MIKE MURPHY, Judge**

Appellants Leanne Carpenter and Shelley Benton contest the validity of the second codicil to the will of their grandmother, Anna Belle Patterson. They appeal from the Prairie County Circuit Court's order dismissing their claims. On appeal, Leanne and Shelley contend that the trial court erred in finding that (1) they failed to prove their brother, Corey Patterson, exhibited undue influence over Anna Belle; (2) Corey overcame his burden of proof that Anna Belle had testamentary capacity at the second codicil signing; and (3) Corey overcame his burden of proof that Anna Belle was not unduly influenced. We affirm.

On October 20, 2013, Anna Belle died, leaving as her heirs Leanne, Shelley, and Corey, her three grandchildren. On October 30, 2013, Anna Belle's will and first and second codicils were admitted to probate, and Corey was appointed executor. The will, signed in

1996, and the first codicil, signed in 2003, provided for the residue of her estate to pass in trust to her husband, Willie B. Patterson, who died December 26, 2006. It was to pass then in trust for her only child, Willie Joe Patterson, who died December 3, 2011. After those two had died, the residue was to be divided equally among Leanne, Shelley, and Corey. Anna Belle's husband, Willie B., signed a will and first codicil at the same time, mirroring Anna Belle's. Anna Belle's second codicil, signed in 2009, left the trust assets at her and Willie Joe's deaths solely to Corey. The second codicil stated that Anna Belle made the codicil partially due to efforts by Willie Joe, Leanne, and Shelley to remove Corey as the administrator in the proceedings of Willie B.'s estate.

Leanne and Shelley petitioned to contest the second codicil to Anna Belle's will, and a hearing on the petition was held July 1, 2021.[1] Prior to the hearing, the court found that a "confidential relationship" existed between Corey and Anna Belle, which created a rebuttable presumption of undue influence.[2]

At the hearing on the petition, the deposition testimony of Linville Jones, Anna Belle's brother-in-law, was admitted into evidence. Leanne and Shelley deposed him on July 16, 2015, in connection with their contest. Linville, now deceased, testified that he made the appointment with Anna Belle's attorney to change her will because she asked him to. He

---

[1]There is no dispute that the last will and testament and the first codicil were executed while Anna Belle had testamentary capacity and without undue influence.

[2]Corey had power of attorney to assist Anna Belle with the family farm and pay her bills since around 2004.

2

testified that "she wanted to make sure the girls didn't get anything" and that "she knew exactly what she was doing" the day she signed the codicil. Additionally, a letter dated August 14, 2009, from Dr. Ramirez, Anna Belle's treating physician, was entered into evidence. The letter provided that he evaluated her on July 17, 2009. It stated in part:

> I have found her diagnosis to be Alzheimer's Dementia, Mild. I did a full mental status examination and can state that she has a good attention span and good recollection, especially given her age and her diagnosis. I have found she is rational and relevant and goal directed in her thinking and does not suffer from any delusional ideations and knows exactly what she is saying. Her biggest problem is communication due to her extreme hearing loss. It is my professional opinion that she is in possession of the capacity to make informed consent in regards to her personal and financial affairs. . . .

Dr. Jeffrey Rains testified first at the hearing that he has been performing mental evaluations for twenty-eight years and that he evaluated Anna Belle on July 20, 2009. During that hour-long appointment, he conducted a mini mental-status exam and evaluated her for capacity to offer informed consent. He stated that she gave him no reason to think that she did not understand the questions. Dr. Rains testified that memory loss was normal for her age but that she logically answered questions about her personal finances and evaluated the risks and benefits of the scenarios discussed in the exam, exhibiting that she had the capacity to offer informed consent concerning her money. He testified that her responses led him to believe that she was "rational, relevant, and goal-directed." Dr. Rains stated, "[S]he convinced me very clearly that she knew what she had and what she wanted to do with it."

Dr. Rains was unconcerned that Anna Belle did not know exactly how much land or money she had. He explained that just because someone does not know how much money

they have does not mean they are incompetent and do not know what they want to do with the money. He testified that if the standard was recalling every detail about how much money or property you have, then most people over the age of fifty lack capacity.

Additionally, Dr. Rains was unconcerned that Anna Belle was unduly influenced. He further testified that he knew of no intervening events that would have changed his evaluation of her and that she would have been competent within sixty days of the evaluation, which was when the second codicil was signed.

Donald Raney, the attorney who drafted the second codicil, testified he had known Anna Belle for thirteen years. He explained that in July 2009, Linville contacted him because Anna Belle wanted to change her will. Linville made an appointment and Raney met with him, Anna Belle, and her sister. Raney testified that he anticipated the codicil would be the subject of litigation, so he made an unannounced visit to her at the nursing home sometime later. She recognized him, and without prompting. inquired about the codicil, so he felt comfortable moving forward. The second codicil was executed a couple of days later. He testified that he read it to her, stopped occasionally, and asked, "Is that what you want to say in your second codicil?" and she responded yes. He testified that he would not have prepared the second codicil if he had any concern about her competency or if someone was influencing her. He said Corey never contacted him about the codicil, and he never told Corey about it.

April Branham worked as a nurse at the nursing home where Anna Belle stayed. She testified that Corey and his wife were very helpful in the care of Anna Belle and that she only

saw Leanne and Shelley visit one time. Nurse Branham testified that she never talked to Anna Belle about her estate planning. She said Anna Belle only appeared confused just before her death in 2013.

Corey testified he lived next door to his grandparents and visited with them daily for fifteen to twenty years, even when they went into the nursing home. He was not made aware of the second codicil until after Anna Belle's death. He testified that he never restricted who could visit and never tried to prevent his sisters from visiting Anna Belle. Corey testified that Anna Belle's main health issue was her hearing and that as long as she had her hearing aid in and you talked slow and plain to her, she did not have an issue with her dementia diagnosis.

Unlike Corey, Leanne testified that she and Shelley have families and did not live conveniently close to Anna Belle. She testified that when she would call the nursing home to inquire about Anna Belle's care, she was told that she could not be informed. Additionally, Corey would not talk to her. She testified that she and Shelley contacted Raney about probating Willie B.'s will because Corey had not done so. She said they did not intend to remove Corey as administrator so they could take Anna Belle's land or money.

Shelley's testimony mirrored Leanne's testimony. She testified that intimidation was used to keep her and her sister away from Anna Belle; for example, she said that if she were by herself visiting, someone stood outside the door while she visited. She also testified that she and Leanne were told they could not take Anna Belle out for a drive without first asking

Corey and his wife. She said Anna Belle talked about wanting to go home but that Corey would not let her.

Dr. Garrett Andrews, a neuropsychologist, testified on behalf of Shelley and Leanne as an expert witness. He reviewed Dr. Ramirez's and Dr. Rains's medical reports, the will, the medical records, the nursing notes, and Anna Belle's deposition from May 2009 that was taken in the matter of Willie B.'s estate. Dr. Andrews drafted a letter opinion based on this information. He specifically opined,

> It is my opinion, within a degree of neurocognitive certainty, [Anna Belle's] ability to appreciate, understanding, and conduct her wishes freely was compromised at the time of her signing the Second Codicil to her Will on 10/7/2009. She demonstrated significant deficits in her thinking abilities including memory and comprehension well before 2009 as the medical records indicate and several providers commented on.

Following the hearing, the court entered an extensive order in favor of Corey, finding that Anna Belle had the capacity to execute the second codicil and that she was not unduly influenced into doing so.

We review probate proceedings de novo, and we will not reverse the decision of the trial court unless it is clearly erroneous. *In re Est. of Haverstick*, 2021 Ark. 233, at 5, 635 S.W.3d 482, 485.

Leanne and Shelley first argue that the court erred in finding that they failed to present any evidence to prove undue influence because it was Corey's burden to prove.

As the court's order states, it previously ruled that due to the confidential relationship between Anna Belle and Corey, Corey had the burden of proving by a preponderance of the

6

evidence that the second codicil was not the product of undue influence. The order detailed evidence that supported this finding. It then found, "[T]here was no evidence presented by the contesting parties to prove that [Corey] exhibited undue influence over Anna Belle." Immediately following this finding, the court specifically found that Corey had met his burden to rebut the presumption that Anna Belle was unduly influenced. Having given this matter our de novo review, it is apparent that the court did not erroneously shift the burden of proof; rather, the court weighed the evidence and found that Corey had met his burden, and Leanne and Shelley had presented nothing to counteract it.

Leanne and Shelley's final two points on appeal challenge the court's finding that Anna Belle had testamentary capacity at the signing of the second codicil and that she was not unduly influenced.

In a typical will contest, the burden of proving the invalidity of a will due to lack of testamentary capacity, undue influence, or fraud is on the contestant. *See Wiseman v. Keeter*, 2018 Ark. App. 302, at 19, 550 S.W.3d 883, 893–94. If the proponent of a will, however, procures the making of the will, then a presumption of undue influence arises, and the burden shifts to the proponent to prove that the testator had testamentary capacity and was free from undue influence in executing the will. *Id.* If there exists a confidential relationship between the testator and the primary beneficiary, then a rebuttable presumption of undue influence arises. *Id.* The ultimate burden of proof remains on the contestant.

Here, the circuit court fluctuated on whether a confidential relationship shifts the burden on undue influence *and* testamentary capacity or just undue influence. The court

verbally said that if Corey showed no undue influence, then Leanne and Shelley had to prove Anna Belle lacked testamentary capacity. However, the order put the burden of both on Corey, which was erroneous.

Despite the court's order misstating the law, we may disregard the error because our de novo review allows us to reach a different result required by the law. *See In re Est. of Haverstick*, 2021 Ark. 233, at 5, 635 S.W.3d at 485. In *Haverstick*, the circuit court erred by not finding a confidential relationship between spouses and by not requiring the wife to rebut the presumption of undue influence; however, the supreme court applied the correct burden-shifting analysis and affirmed. Again, we reiterate that the existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence. *Union Nat'l Bank v. Leigh*, 256 Ark. 531, 532, 509 S.W.2d 539, 540 (1974).

Turning to testamentary capacity, if a testator has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property and to comprehend how he is disposing of it and to whom and upon what consideration at the time the will is executed, then he possesses sufficient mental capacity to execute a will. *Hodges v. Cannon*, 68 Ark. App. 170, 179, 5 S.W.3d 89, 96–97 (1999). Evidence of the testator's mental condition, both before and after execution of the will at issue, is relevant to show his mental condition at the time he executed the will. *Id.* A testator's old age, physical incapacity, and partial eclipse of mind will not invalidate a will if he has the requisite testamentary

capacity when the will is executed. *Id.* A testator does not lack testamentary capacity merely because old age has impaired his mental faculties. *Id.*

The evidence established that Anna Belle had the requisite testamentary capacity to execute the second codicil. The attorney, Raney, ensured Anna Belle had testamentary capacity because, as he testified, he knew a legal battle would ensue upon her death, so he recommended evaluations by Drs. Rains and Ramirez. He also visited with her multiple times to ensure she wanted to change her will, including one unannounced visit at the nursing home where Anna Belle recognized him without prompting. Linville Jones's deposition testimony that Anna Belle wanted to change her will also supports the court's finding as well as Nurse Branham's testimony. Additionally, Dr. Rains gave a favorable opinion supporting capacity. Last, Dr. Ramirez's note that "she is competent to make decisions [about] her estate" supports the court's finding.

Leanne and Shelley's argument is a request to reweigh the evidence. They contend that no one testified nor did any exhibits detail that Anna Belle knew the nature and extent of her property when she executed the second codicil. They take issue with the fact that testimony did not establish that Anna Belle knew exactly how much money she had or the exact acreage of her property. However, Arkansas law does not define "nature and extent of property" with such precision. Rather, our supreme court has held, "With respect to the ability to know the extent and condition of the property to be disposed of . . . it is unnecessary that he actually has this knowledge. It is sufficient if he has the mental capacity to understand

9

the effect of his will as executed." *Puryear v. Puryear*, 192 Ark. 692, 94 S.W.2d 695, 697 (1936). Accordingly, we find no error.

Turning to undue influence, we have held that it is not the influence that springs from natural affection; rather, it results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property, and it must be specially directed toward the object of procuring a will in favor of particular parties. *Robinson v. Est. of Robinson*, 2016 Ark. App. 130, at 6, 485 S.W.3d 261, 265. Undue influence may be inferred from the facts and circumstances of a case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility. *Id.*

Here, there is no evidence of coercion that would indicate that the will was not a reflection of Anna Belle's intent at the time the will was drafted. Changing her will was something that she wanted to do on her own, and Corey was not aware of the second codicil until after Anna Belle's death. Leanne and Shelley's argument is again a request to reweigh the evidence. In light of the evidence and testimony presented at the hearing, which has been extensively discussed above, we cannot say that the trial court erred in finding that Corey rebutted the presumption of undue influence. *See Pyle v. Sayers*, 72 Ark. App. 207, 211, 34 S.W.3d 786, 788 (2000) (holding that questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considers them together). Accordingly, we affirm.

Affirmed.

GLADWIN and THYER, JJ., agree.

*Richard F. Hatfield, P.A.*, by: *Richard F. Hatfield*; and *Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor*, for appellants.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellee.